ROBERT E. DION vs. BOARD OF APPEALS OF WALTHAM
(and a companion case[1]).

Middlesex.    May 10, 1962. — June 12, 1962.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER,
& SPIEGEL, JJ.

*Zoning*, Variance; Board of appeals: decision, notice of hearing, application for variance. *Administrative Board*. *Real Property*, Straw. *Evidence*, Burden of going forward. *Equity Pleading and Practice*, Zoning appeal.

In a suit in equity by way of appeal to the Superior Court from a decision of the board of appeals of a city granting with restrictions a zoning variance permitting the erection and use in a residential district of a filling station on a low triangular lot bounded by two streets and an easement for electric power lines and near an easement for an underground gas pipe line, an area recently rezoned for "limited commercial" use and a State highway, findings by the trial judge that "for some time the . . . [lot] has presented an unsightly appearance due to clandestine dumping . . . difficult . . . effectively [to] control" and that the "high tension wires, the isolating effect of the two easements and streets, the substreet level of the land and its triangular shape and location," and peat on the lot and a brook precluded residential use of the lot were justified by the evidence and it could not be said that the judge was plainly wrong in concluding that within G. L. c. 40A, § 15 (3), as amended, a literal enforcement of the ordinance would "involve substantial hardship" to the owner of the lot "owing to conditions especially affecting" the lot "but not affecting generally the zoning district in which it . . . [was] located." [550–552]

The provisions of G. L. c. 40A, § 18, as amended, were complied with by the board of appeals of a city in granting a zoning variance in 1960 where the board, after filing with the city clerk its decision containing an inadequate statement of its reasons, amended its decision at an executive session some days later by stating the reasons at greater length and thereafter, within the twenty day appeal period from the filing of the original decision, ratified the amended decision by vote at a public meeting. [552–553]

A certain notice by a board of appeals that it would hold a public hearing on a petition "to erect and use a filling station" on land in a residential zoning district amply indicated that the petition was for a zoning vari-

---

[1] City Council of Waltham & another vs. Board of Appeals of Waltham & another.

ance even though the notice did not specifically so describe it. [553–554]

G. L. c. 40A, § 15 (3), as amended, authorizes a board of appeals to grant a zoning variance upon direct petition to it where a variance must be obtained before a desired permit may be granted. [554]

One having the record title to real estate as straw for another to whom he had given an unrecorded deed thereof had standing to apply for a zoning variance. [554–555]

At the trial of a suit in equity by way of appeal to the Superior Court from a decision of a board of appeals granting a variance under G. L. c. 40A, § 15 (3), as amended, the burden rests upon the applicant for the variance and upon the board to go forward with evidence that the statutory prerequisites for the granting of a variance have been met and that the variance is justified. [555–556]

Two BILLS IN EQUITY filed in the Superior Court on May 24, 1960, and May 27, 1960, respectively.

The suits were heard by *Wisnioski,* J.

*John A. McCarty* for Dion.

*William J. Bannan, Jr.,* City Solicitor, for the City Council of Waltham and another.

*George A. McLaughlin (Arthur M. Gilman* with him) for the Board of Appeals of Waltham.

CUTTER, J.  In May, 1959, one Maynard purchased over nineteen acres of land in Waltham at the northeast corner of Trapelo Road (which runs approximately east and west) and Smith Street (which runs roughly north and south). This land had a frontage of 760 feet on Trapelo Road and of 375 feet on Smith Street.  The nineteen acre lot was purchased subject to two easements, one 250 feet wide granted in 1947 to Boston Edison Company (Edison), and the other a narrower grant to Algonquin Gas Transmission Company (Algonquin) for an underground pipe line.  Upon the Maynard land, the southerly edge of the Edison easement runs roughly northwest and southeast and crosses Trapelo Road about 200 feet east of the junction of Trapelo Road and Smith Street.  It crosses Smith Street about 180 feet north of that junction.  The southerly edge of the Edison easement between Smith Street and Trapelo Road is about 350 feet long and with those two ways forms a triangle (the locus) containing about 25,000 square feet.

At the time of the 1959 purchase, the nineteen acres had

been zoned as part of an extensive A–3 single residence district since 1952. About the time of the purchase, an area near and northwest of the purchased land was rezoned for "limited commercial" use. This area is now occupied by the plant of Clevite Corporation (Clevite).

Maynard, in purchasing the land, acted as "straw" for Mr. Connolly, an attorney, and at once gave Mr. Connolly a deed of the property, which has not been recorded. The stamps on the deed to Maynard indicate that Mr. Connolly paid about $19,000 for the entire nineteen acre parcel. Within a week after the purchase, Mr. Connolly began negotiations for the sale of the locus and, before the end of May, 1959, had agreed to sell it for $25,000, provided permission to maintain a filling station upon it could be obtained.

On June 8, 1959, a petition for a change of zone for the whole nineteen acre parcel was filed with the city council. The petition was given "leave to withdraw" on December 4, 1959. On February 15, 1960, Mr. Connolly (through Maynard) applied for permission "to erect and use a filling station on Trapelo Road at the northeast corner of Smith Street." The board of appeals, after a public hearing, on May 3, 1960, voted that Maynard's "appeal . . . be granted" with various restrictions as to the type of building, fencing, hours and type of use, signs, and lighting. The board at first made findings only in substantially the words of the zoning statute. See G. L. c. 40A, § 15, cl. 3 (as amended through St. 1958, c. 381).[2] On May 9, a record of the board's original decision was filed with the city clerk. See G. L. c. 40A, § 18 (inserted by St. 1954, c. 368, § 2; see amendment by St. 1960, c. 326, not effective until after the

---

[2] Section 15, as amended, reads, "A board of appeals shall have the following powers: . . . 3. To authorize *upon appeal, or upon petition in cases where a particular use is sought for which no permit is required,* with respect to a particular parcel of land . . . a variance from the terms of the applicable zoning ordinance . . . where, owing to conditions especially affecting such parcel . . . but not affecting generally the zoning district in which it is located, a literal enforcement of the provisions of the ordinance . . . would involve substantial hardship, financial or otherwise to the appellant, and where desirable relief may be granted without substantial detriment to the public good and without nullifying or substantially derogating from the intent . . . of such ordinance . . . but not otherwise" (emphasis supplied).

board's proceedings in this case; see St. 1962, cc. 203, 212). On May 20, 1960, at an executive session the board amended its decision of May 3, by stating the reasons for its decision at greater length, in effect adding to the statutory language of § 15 (see cl. 3, fn. 2, *supra*), the additional language set out in the margin.[3] The amended decision was added by vote to the records of a public meeting held on May 24, 1960.

The members of the Waltham city council and the building inspector (hereinafter collectively referred to as the council) and also Dion appealed. These appeals were heard by a Superior Court judge who made voluntary findings, rulings, and an order for a decree. A final decree was entered in each case stating that the board of appeals "did not exceed its authority by granting a variance." Dion and the council then appealed to this court. The evidence is reported.

The trial judge found essentially the facts already stated with respect to the locus, the Edison and Algonquin easements, the 1959 rezoning of the area occupied by Clevite, and the proximity of Route 128 ("about 800 feet from the" locus). He found also that "[f]or some time the . . . [locus] has presented an unsightly appearance due to clandestine dumping . . . which would be difficult . . . effectively [to] control . . . [because of] the accessibility of the

---

[3] The additional reasons were: "5. That the parcel . . . has changed in character . . . because of the [business] use of adjoining land [referring to the Edison and Algonquin easements] . . . . 6. That . . . test borings . . . indicate that there is . . . peat below the surface of the land . . . which presents conditions affecting this parcel of land but . . . not . . . generally . . . the zoning district . . . . 7. That [use of] this parcel . . . as a dump . . . has . . . [made] it impossible to use the land for residential purposes without . . . undue hardship both financially and otherwise to the [p]etitioner. 8. That this parcel . . . has been isolated from the remaining residential properties by the Edison . . . [and] Algonquin . . . easement[s] and . . . Trapelo Road and Smith Street . . . . 9. That the . . . variance . . . would in no way be a detriment to the public good or a nuisance . . . for . . . [a gasoline station] is the only use which could be made of the land because of its location and . . . [topography] . . . . 10. . . . In its present condition . . . [the locus] is an unsightly and undesirable dump that creates a health menace . . . . It will not create a traffic hazard . . . . 11. Public convenience . . . requires . . . a filling station . . . [in this] area . . . . 12. The property . . . does not lend itself to good residential use because of the close proximity of Route 128 . . . . 13. The property is . . . [close to] Clevite Corporation . . . ."

vacant land at this intersection. . . . The presence of the high tension wires, the isolating effect of the two easements and streets, the substreet level of the land and its triangular shape and location at an intersection are all factors which must have foreclosed any possible residential use for this lot. The presence of the peat deposits and the brook . . . [support] this conclusion." He concluded "that as to this lot of land, owing to conditions especially affecting it but not affecting generally the zoning district in which it is located a literal enforcement of the zoning . . . [ordinance] would involve substantial hardship, financial or otherwise, to its owner. The net result would be to force the owner of an isolated triangular lot which due to its location and low level invites unsightly dumping . . . to incur expense and hardship where any possible use as residential building . . . is virtually ended. . . . [R]elief can be granted by variance without substantial detriment to the public good and without . . . substantially derogating from the intent . . . of the zoning . . . [ordinance]. The . . . isolating factors . . . set it apart from the surrounding residential areas . . .." The judge thought that a filling station would increase traffic at the intersection but that it was unlikely "that the new use will cause any greater increase . . . than did the recent commercial expansion from Route 128 to Smith Street."

1. The trial judge's subsidiary findings are fully justified by the evidence. The judge also took a view of the locus.

The judge's conclusion, to which most serious objection is made, is that relating to special hardship affecting the locus. Maynard's predecessors in title doubtless received compensation for the injury to the lot of which the locus is a part, caused by the Edison and Algonquin easements. Special hardship affecting this lot can hardly be found by reason of their presence. These easements (as photographs in evidence show), even if paid for, did have the effect of isolating this lot from nearby residential areas, and this isolation has bearing upon whether it is reasonable to treat

it separately.  The proximity of the lot to the nearby Clevite plant, recently rezoned, was a circumstance which could reasonably be regarded as more directly and adversely affecting the isolated locus than other parcels in the neighborhood.  Cf. *Shacka* v. *Board of Appeals of Chelmsford,* 341 Mass. 593, 595.  Peat deposits appear to have been present in other parts of the lot of which the locus was a part.  There was substantial testimony, however, of peat deposits on this particular parcel which would make it less useful for residential building.  See *Rodenstein* v. *Board of Appeal of Boston,* 337 Mass. 333, 335–337 (pudding stone).  We give no weight to Mr. Connolly's loss of profit on a possible resale as constituting special hardship.  See *Bruzzese* v. *Board of Appeals of Hingham,* 343 Mass. 421, 423–424.  See also *Cary* v. *Board of Appeals of Worcester,* 340 Mass. 748, 750.  Nor would dumping upon the locus, affirmatively permitted by Maynard's predecessors in title, constitute special hardship.  There was evidence, however, that the dumping was not readily controllable.  Taking all proper considerations into account we cannot say that the trial judge was plainly wrong in determining that there was special hardship affecting the locus but not generally affecting the balance of the district.

It will serve no useful purpose further to summarize the evidence.  The judge's findings and those of the board adequately complied with the statutory requirements.  See G. L. c. 40A, § 15, cl. 3, as amended (fn. 2, *supra*) ; *Barnhart* v. *Board of Appeals of Scituate,* 343 Mass. 455, 456–457.

2.  The principal basis for the council's contention that the board of appeals did not comply with c. 40A, § 15, cl. 3, appears to be that the amendment on May 20 of the board's original decision of May 3 (which was deficient under the doctrine of *Gaunt* v. *Board of Appeals of Methuen,* 327 Mass. 380, 381–382; cf. *Cefalo* v. *Board of Appeal of Boston,* 332 Mass. 178, 181) was not compliance with G. L. c. 40A, § 18.  We assume that meetings of the board of appeals must be public.  See G. L. c. 39, § 23A (inserted by St. 1958, c. 626, § 4; see later amendment by St. 1960, c. 437,

§ 3). Nevertheless, by c. 39, § 23C (inserted by St. 1960, c. 437, § 5, effective under § 7 as of January 5, 1959), "action otherwise duly taken at any meeting shall not be invalidated by the failure of any officer to carry out . . . responsibilities for public notice of meetings." In any event, the action taken in executive session on May 20 was ratified by action at a public meeting on May 24, 1960, which was well within the appeal period of twenty days after the May 3 decision was filed (on May 9) in the city clerk's office. See G. L. c. 40A, § 21, as amended through St. 1958, c. 175 (see also later amendment by St. 1960, c. 365). No change in the result of the board's decision of May 3 was made on May 20. The amendment added only a statement of further reasons. It was within the board's inherent administrative power thus to amend its decision within a reasonable period which we think extended at least during the appeal period. See *Spaulding* v. *Board of Appeals of Leicester,* 334 Mass. 688, 690, 692, where a supplemental decision was filed many months after an inadequate original decision, but where the board, even in its supplemental decision, failed to find substantial hardship. See also *Fortier* v. *Department of Pub. Util.* 342 Mass. 728, 731–733.

3. The notice of Maynard's petition to the board of appeals amply indicated that it was a petition for a variance. To grant a variance appears to have been the only action that the board of appeals had power to take on Maynard's petition that he "be allowed to erect and use a filling station" on the locus. Maynard, by his petition, seems to have sought to remove merely the zoning obstacle to his conducting a filling station on the locus. Without such a variance it would be futile for him to seek a filling station permit under any ordinance adopted pursuant to G. L. c. 143, § 3 (as amended through St. 1959, c. 607, § 2), or license to store gasoline at the locus, G. L. c. 148, § 13 (as amended through St. 1958, c. 251; see later amendment by St. 1959, c. 353, § 1). See G. L. c. 94, § 295B (as amended through St. 1957, c. 443). It would have been appropriate, in the notice of the hearing on Maynard's petition, to have

described the petition in explicit terms as one for a variance (see *Spaulding* v. *Board of Appeals of Leicester,* 334 Mass. 688, 692), but in context the nature of the petition was apparent from the notice which referred with precision to the then existing zoning. The council in its appeal to the Superior Court alleged that Maynard's petition was "for a variance." There is no indication that anyone misunderstood its purpose. Indeed, numerous neighbors requested in writing that the board of appeals "grant a variance to . . . Maynard."

General Laws c. 40A, § 15, cl. 3, gives to the board of appeals power to authorize a variance "upon appeal, or upon petition in cases where a particular use is sought for which no permit is required" (see fn. 2, *supra*). We think that this somewhat confusing language[4] permits the board to grant a variance either (a) upon appeal (c. 40A, § 13, as amended through St. 1955, c. 325, § 1) from the denial, under § 12, of a requested permit on the ground that to grant it would be in violation of the zoning ordinance, or (b) upon direct petition to the board of appeals for a variance where it is obvious that, because of the zoning ordinance, a variance must be obtained before a permit may be granted. In the absence of more compelling statutory language, we do not interpret § 15, cl. 3, as requiring, as a prerequisite to a petition for a variance, the empty gesture (see *Leigh* v. *Rule,* 331 Mass. 664, 669; *LaVallee* v. *Cataldo,* 343 Mass. 332, 334) of applying for a permit in those cases where everyone knows that the zoning ordinance precludes the permit.

4. Maynard, holder of record title to the locus, had standing to apply for a variance. As a "straw" for Mr. Connolly, the holder of an unrecorded deed from Maynard covering the locus, Maynard in effect held the record title as fiduciary for Mr. Connolly. See *Collins* v. *Curtin,* 325 Mass. 123, 125–126; *Barche* v. *Shea,* 335 Mass. 367, 370; *Kennedy* v. *Innis,* 339 Mass. 195, 200.

---

[4] The language had its origin in St. 1935, c. 388, § 2, amending G. L. c. 40, § 30, as appearing in St. 1933, c. 269, § 1. See 1933 House Doc. No. 1240, pp. 43, 89–93, 115–118; 1935 House Docs. 414, 2080.

This fiduciary interest, as owner of record, despite the unrecorded deed which passed legal title to Mr. Connolly (see *Jacobs* v. *Jacobs,* 321 Mass. 350), was sufficient to permit Maynard, as fiduciary or agent for Mr. Connolly, to apply for a variance. See *Marinelli* v. *Board of Appeal of Boston,* 275 Mass. 169, 171–173; *Carson* v. *Board of Appeals of Lexington,* 321 Mass. 649, 652.

5. At the outset of the hearing before the trial judge, Dion's counsel asked for a ruling that the "burden is on the . . . [board of appeal] to establish by evidence that the condition precedent to any valid action by the [b]oard . . . required by G. L. c. 40A, § 15, was met before the appellant is required to introduce any evidence." The trial judge refused so to rule.

This request merely asked the judge to rule which party or parties had the burden of going forward with the evidence. He did not rule upon the issue until his order for a decree. At that stage of the case, the ruling had become immaterial, because all the evidence was before the court. All parties had been given full opportunity to present any relevant evidence. There is no indication that any relevant evidence was offered and excluded. The judge appears to have made his findings after appropriate consideration of all the evidence.

Although the ruling was immaterial when made, it is appropriate to state our view that the judge ruled incorrectly. Variances are to be granted sparingly and granting them has been surrounded by many statutory safeguards. See *Pendergast* v. *Board of Appeals of Barnstable,* 331 Mass. 555, 557–559; *Stark* v. *Board of Appeals of Quincy,* 341 Mass. 118, 121. The legislative policy of avoiding variances, except upon a clear showing that the prerequisites have been satisfied, the circumstance that no evidentiary weight may be given to the board's findings (see *Devine* v. *Zoning Bd. of Appeals of Lynn,* 332 Mass. 319, 321), and the provisions for a new hearing, viewed together, show that the burden rests upon the person seeking a variance and the board ordering a variance to produce evidence at

the hearing in the Superior Court that the statutory prerequisites have been met and that the variance is justified. Whatever may be the practice in other jurisdictions in similar matters (see Rathkopf, Zoning and Planning [3d ed.] c. 64, § 13; Davis, Administrative Law, §§ 14.14, 29.07–29.10; note, 65 Harv. L. Rev. 1217), the Massachusetts statutory provisions lead to this conclusion. The general principles stated in the *Pendergast* case, of course, are applicable where the board of appeals has denied a variance. The question of where the ultimate burden of proof lies is not presented.

6. There was no prejudicial error in the admission of various items of evidence, over the objection and subject to the exception of Dion's counsel.

*Decree affirmed in each case.*