ANNETTE GORDON vs. ZONING BOARD OF APPEALS OF LEE
& others.[1]

Berkshire. January 23, 1986. — June 12, 1986.

Present: PERRETTA, CUTTER, & SMITH, JJ.

*Zoning,* Variance, Frontage, Person aggrieved, Judicial review. *Practice, Civil,* Zoning appeal.

On appeal from a decision of a zoning board of appeals granting a variance from the frontage requirements of the town's zoning by-law, the judge did not abuse his discretion in determining that, in the absence of evidence to the contrary, the plaintiff, an abutter of the parcel in question entitled to receive notice under G. L. c. 40A, § 11, was a person aggrieved within the meaning of c. 40A, § 17, and thereby had standing to challenge the granting of the variance. [347]

An applicant for a variance to allow the construction of a single family dwelling and garage on land of some five acres with less than the minimum 125 feet of frontage on a public way required by a zoning by-law was not entitled to prevail on his claim on appeal that compliance with the frontage requirement would compel an uneconomic use of the land and would cause a substantial hardship due to the shape, location and configuration of the lot "since the land could not be sold without a variance," where the record indicated that any hardship to the applicant or to his prospective purchaser was the result of the applicant's previous conveyance, with knowledge of the zoning requirements, of portions of his property fronting on a public way without retaining the zoning minimum of 125 feet of frontage to provide access to the remaining back land. [350-351] CUTTER, J., dissenting.

CIVIL ACTION commenced in the Superior Court Department on July 11, 1984.

The case was heard by *John L. Murphy, Jr.,* J.

*Jessie Doyle Deely* for the plaintiff.

*Don C. Hunter* for William B. Salinetti & another.

---

[1] William B. Salinetti and Roger Scheurer.

PERRETTA, J. After the defendant board granted a variance so that a house and garage could be built on a parcel of land lacking the frontage required by the zoning by-law, the plaintiff abutter appealed to the Superior Court pursuant to G. L. c. 40A, § 17.[2] The judge heard the matter, de novo, and made findings in support of his conclusion that the prerequisites to the granting of a variance, as set out in G. L. c. 40A, § 10, had been met. However, because he also concluded that the board's decision was too conclusory but nonetheless remediable,[3] he annulled that decision and remanded the matter for further proceedings. Upon the board's resubmission of more particularized findings, the judge affirmed the board's decision. Although we agree with the judge that the plaintiff abutter has standing to challenge the granting of the variance, we conclude that his findings setting out the justification for the variance lack evidentiary support. We reverse.

1. *The Evidence.*

At the Superior Court trial, there was evidence to show the following facts. In 1969, William B. Salinetti (Salinetti) and his three sons, as tenants in common, bought about eight to nine acres of vacant land which, on its westerly side, had well over 600 feet of frontage on Fairview Street in Lee (the town). To the east, the land abuts about thirty acres of land owned by the plaintiff, Gordon. The northern boundary runs along a seventy-five-foot wide right of way which is included in the parcel, and the southern boundary is the Massachusetts Turnpike, to which there is no access from the Salinetti or Gordon properties.

---

[2] Although the planning board of Lee also claimed an appeal to the Superior Court, that court's docket does not reflect an appeal by the planning board to this court from the judgment upholding the variance. Additionally, the planning board did not file a brief in this court. See Mass.R.A.P. 16(a) (4), as amended, 367 Mass. 921 (1975). That board, therefore, is not a party to this appeal.

[3] See *Josephs* v. *Board of Appeals of Brookline,* 362 Mass. 290, 300 (1972); *Williams* v. *Building Commr. of Boston,* 1 Mass. App. Ct. 478, 481 (1973), where the findings of the boards were held to be inadequate but remediable at further hearings.

In 1976, when the zoning by-law required residential build-
ing lots to have at least 125 feet of frontage, the Brisson
Corporation purchased a portion of the Salinettis' land fronting
on Fairview Street, leaving the Salinettis with more than five
acres (the locus) to the back of the land which abuts the Gordon
property.[4] According to Salinetti, Brisson first intended to lay
out five lots, each having 100 feet of frontage. The planning
board supposedly agreed to this proposal because other house
lots on Fairview Street had that frontage and that was all that
had been required under the earlier zoning by-law. When the
selectmen objected, however, Brisson divided the land into
lots of which four met the minimum 125 feet frontage require-
ment.

After the Brisson purchase, the Salinettis' land, the locus,
could be characterized as a "double pork-chop." The frontage
on Fairview retained by the Salinettis is divided into two parts:
the seventy-five-foot wide right of way at the northerly end
and a twenty-five-foot wide strip of land at the southerly end.
Gordon has an easement, from her land to Fairview Street, in
part over the strip seventy-five feet in width at the northern
end of the locus. The area, after the Brisson purchase, is shown
on the accompanying sketch, *infra* 356.

When the Salinettis sold their land to Brisson in 1976,
Salinetti was aware that the zoning by-law required for residen-
tial use a minimum frontage on Fairview Street of 125 feet.
However, according to Salinetti's testimony, he "had no further
plans for the land" other than to enter upon it occasionally "to
get some cordwood," which is the reason the Salinettis retained
the southerly twenty-five-foot strip.

Salinetti further testified that some six years later, in 1982,
he was approached by the plaintiff's husband about purchasing
the locus, the remaining parcel behind the house lots fronting
on Fairview Street. The parties, however, could not agree on
price. In January, 1983, Roger Scheurer viewed the locus with
an eye towards its purchase. A resident to the north of Salinetti's
land saw Scheurer and Salinetti inspecting the locus and ap-

---

[4] Although Salinetti "could" have sold Brisson larger lots extending into the
back land, Brisson was "just interested in meeting" the frontage requirements.

proached Salinetti about buying the land because he "didn't want any building to go up there, he liked his privacy." Salinetti gave him a week to buy the property, but this resident "backed out." About the same time that Salinetti was negotiating with Scheurer, Salinetti was also approached by a lumber company that "wanted to go in and take the rest of the pine out" but he told the company representative that he "couldn't give him any answer at the present time."[5] That could have been because the Salinettis and Scheurer had reached an agreement of purchase and sale subject to the granting of a variance to use the northerly seventy-five-foot strip as access to a single family house and garage that Scheurer intends to build on the northeastern corner of the locus.

Subdividing the locus has never been considered by Salinetti because, as he testified, he had a "reliable figure of $100 a foot" (or between $30,000 to $40,000 in all) as the cost of developing a "town approved roadway along that seventy-five-foot right-of-way." Salinetti stated that he "couldn't afford to do that if I wanted to."

Roger Scheurer, the prospective purchaser of the locus, testified that he had looked for a residential building lot in Lee for about a year. He spoke with real estate agents and drove about the town looking for house lots. He would then approach the lot owners to "see if they had land for sale; and there was very little response, very little land available to purchase." From these events, Scheurer formed the opinion that, for a prospective purchaser of a lot in Lee, there is a shortage of available lots. Scheurer described the shape of the locus as "unique in that it has frontage which is noncontinuous." He, like Salinetti, has no intention of subdividing the locus because the cost of building a town approved road was "underestimated" by Salinetti; it would cost a "quarter of a million dollars to put in a road."

Water drainage in the area is also "unique" according to Scheurer. The land at the northeastern corner, the proposed

[5] Salinetti had no idea of the fair market value of the land "for logging purposes" other than his general understanding that "logs are . . . now . . . a depressed market."

building site, is relatively level. The slope of the land carries off water from the northeast corner of the locus, creating a water condition at the bottom of the slope nearest Fairview Street. The Gordon property was not as "wet in the same fashion [in] that they were more or less on a top of the hill, until it drops off on the other side." At least three of the houses on the building lots on Fairview Street "have water problems in their cellars."

2. *Gordon's Standing.*

General Laws c. 40A, § 17, as amended through St. 1982, c. 533, § 1, provides that "[a]ny person aggrieved by a decision of the board of appeals . . . . may appeal to the superior court." As an abutter entitled to receive notice under G. L. c. 40A, § 11, of the public hearing before the board on the application for a variance, Gordon is presumed to be a person aggrieved. That presumption is rebuttable. See *Marotta* v. *Board of Appeals of Revere,* 336 Mass. 199, 204 (1957). Citing *Marotta,* the trial judge stated: "In the absence of evidence to the contrary, I find that the plaintiff Gordon is an aggrieved party within the meaning of the statute and has a right of appeal."

We see no error in the trial judge's conclusion that Gordon's presumption of standing had not been rebutted. As Salinetti testified, "use of that seventy-five foot right-of-way [is] incorporated in [Gordon's] deed and mine." That it would be necessary to clear and improve part of Gordon's right of way for Scheurer to put in his proposed driveway might appear to him and Salinetti as a benefit to Gordon, but it was not evidence such as to require the trial judge to conclude that Gordon lacked standing to challenge the granting of the variance. "[W]hether a party is 'aggrieved' is a matter of degree [citations omitted]; and the variety of circumstances which may arise seems to call for the exercise of discretion rather than the imposition of an inflexible rule. No abuse of discretion has been shown in this case." *Rafferty* v. *Sancta Maria Hosp.,* 5 Mass. App. Ct. 624, 629 (1977). See also *Paulding* v. *Bruins,* 18 Mass. App. Ct. 707, 709 (1984).

3. *The Variance.*

General Laws c. 40A, § 10, as amended by St. 1977, c. 829, § 4B, authorizes a board of appeals to grant a variance only

where it "specifically finds [a] that owing to circumstances relating to the soil conditions, shape, or topography of such land . . . and especially affecting such land . . . but not affecting generally the zoning district in which it is located, [b] a literal enforcement of the provisions of the . . . by-law would involve substantial hardship, financial or otherwise, to the petitioner or appellant, and [c] that desirable relief may be granted without substantial detriment to the public good and without nullifying or substantially derogating from the intent or purpose of such ordinance or by-law." On an appeal to the Superior Court under G. L. c. 40A, § 17, the judge hears the matter de novo and determines the validity of the board's decision on the basis of the facts found by the judge. See *Kirkwood* v. *Board of Appeals of Rockport,* 17 Mass. App. Ct. 423, 426-427 (1984), and cases therein cited. All the statutory prerequisites set out in § 10 must be met. *Id.* at 427-428.

On the evidence presented in the Superior Court and described in part 1 of this opinion, the trial judge found as follows. The locus is a "double pork chop" lot having a shape "so unusual that it also differs from most, if not all, of the lots in the zoning district." Moreover, the locus is about ten times larger than the surrounding lots fronting on Fairview Street.

Use of the locus is limited by its topography to the construction of a single family house on the northeastern corner, the "relatively level" portion of the locus. The slope of the locus carries off water creating a "water condition at the bottom of the slope nearest Fairview Street." The shape, topography, and soil conditions affecting the locus do "not affect the zoning district generally."

If the variance were not granted, the "only alternative available to the owner would be to construct an acceptable road from Fairview Street to his property." To construct such a road to serve a single home would involve a "prohibitive expense." Compliance with the frontage requirement would "compel an uneconomic use of the land and would force a substantial hardship on the owner since the land could not be sold without a variance." This substantial hardship is "created by the shape,

location and configuration of the lot."[6] The trial judge concluded that the facts presented were substantially similar to those in *Paulding* v. *Bruins,* 18 Mass. App. Ct. 707 (1984). Upon remand and reconsideration (see note 3, *supra*), the board made more appropriate findings in support of the granting of the variance than those first submitted. We need not set out the board's findings, which are substantially similar to those of the trial judge, as the board's decision carried no evidentiary weight in the Superior Court. See *Devine* v. *Zoning Bd. of Appeals of Lynn,* 322 Mass. 319, 321 (1955); *Josephs* v. *Board of Appeals of Brookline,* 362 Mass. 290, 295 (1972).

4. *Discussion.*

Our starting point is the well-established principle that "[n]o person has a legal right to a variance and they are to be granted sparingly." *Damaskos* v. *Board of Appeal of Boston,* 359 Mass. 55, 61 (1971), and cases therein cited. The test is not whether the variance is simply "desirable," *Martin* v. *Board of Appeals of Yarmouth,* 20 Mass. App. Ct. 972, 973 (1985), but whether it is justified, that is, whether there is evidence to show that the statutory prerequisites have been met. See *Dion* v. *Board of Appeals of Waltham,* 344 Mass. 547, 555-556 (1962); *Warren* v. *Zoning Bd. of Appeals of Amherst,* 383 Mass. 1, 10 (1981), and cases therein cited.

When the Salinettis conveyed to Brisson (in 1976) that portion of their land fronting on Fairview Street, the zoning by-law requiring a minimum of 125 feet of frontage for a lot in a residential zone was in effect, and the Salinettis knew of that requirement. That fact makes the present case unlike *Paulding* v. *Bruins,* 18 Mass. App. Ct. at 709, where the pork chop lot "was created in its present form in the 1920's, as far as appears prior to the adoption by the town of any zoning by-law," and identical to the situations found in *Raia* v. *Board of Appeals*

---

[6] Because of the conclusion we reach as to two of the three statutory (§ 10) requirements which "are conjunctive, not disjunctive," *Kirkwood* v. *Board of Appeals of Rockport,* 17 Mass. App. Ct. at 428, we need not consider the trial judge's findings to the effect that the variance could be granted without detriment to the public good and without substantially derogating from the intent of the zoning by-law.

*of N. Reading,* 4 Mass. App. Ct. 318, 321-322 (1976), and *Arrigo* v. *Planning Bd. of Franklin,* 12 Mass. App. Ct. 802, 803-804 (1981). *Raia* and *Arrigo* presented the situation where an owner of a larger tract of land conveyed to another a portion thereof which did not meet the minimum frontage requirements of the then existing zoning requirements, with the result that the new owner could not build without relief from the zoning regulations. In both instances relief was denied as the landowners could not demonstrate a "hardship" within the meaning of G. L. c. 40A, § 10.

Similarly, in *Warren* v. *Zoning Bd. of Appeals of Amherst,* 383 Mass. at 13, an owner of a larger tract of land conveyed a portion of it which did not meet the minimum frontage requirements of the "then existing zoning by-law." In annulling the board's decision granting a variance to the purchaser of the smaller parcel, the court held: "The creation of a nonconforming parcel by such a conveyance does not, without more, entitle the purchaser to a variance."

We see nothing in the present case which constitutes "more" than a proposed conveyance of a nonconforming parcel. "The hardship alleged must arise from the shape of the locus or one of the other factors specifically referred to in § 10." *Guiragossian* v. *Board of Appeals of Watertown,* 21 Mass. App. Ct. 111, 118 (1985). Any hardship to Salinetti or Scheurer does not arise out of the soil conditions or topography of the locus. The slope of the land and consequent water drainage problems relate, at best, to the proposed construction site which was selected to avoid water problems such as those experienced by three of the abutting Fairview Street property owners. The fact of the matter is, however, that the reason a house cannot be constructed on the relatively level northeastern corner of the locus or at any other site on the lot is because it lacks the requisite frontage.

Although the trial judge correctly described the locus as a "double pork-chop" and found that "no other lot in the area [is] of similar shape," those conditions were created by the Salinettis in 1976 for their financial gain. They specifically retained only twenty-five feet of frontage on the southern

boundary so that they could enter onto the land to remove cordwood. They knew that by reason of their conveyance to Brisson, the remaining land would be a nonconforming parcel in the event that residential use were sought in the future. Moreover, until the Salinettis' conveyance to Brisson, there was nothing the least bit unusual about the shape of the tract in its entirety. The slope of the land and the existence of the Massachusetts Turnpike along the southerly boundary were the same in 1976 as they are presently. In short, any "hardship" which currently exists is of the Salinettis' making and could have been avoided easily in 1976.[7]

To be sure, on the evidence presented one could conclude reasonably and readily that the granting of a variance would allow economic use of the locus without detriment to the public good. That conclusion, however, is not dispositive for the board or for us as it ignores the express language of § 10. See *Warren* v. *Zoning Bd. of Appeals of Amherst,* 383 Mass. at 9-10.

There is nothing in the evidence which serves to distinguish the instant case from *Raia, Arrigo,* and *Warren,* which hold that the creation by conveyance of an unusually shaped, nonconforming parcel under then existing zoning regulation does not entitle one to a variance.[8]

---

[7] The sale of the frontage land to Brisson in 1976 constituted the making of a subdivision, because not every lot (in particular, the Salinettis' retained land) thereby created had the frontage then required by the zoning by-law on a public way or a way approved by the planning board. See G. L. c. 41, § 81L. It does not appear from the record whether a plan reflecting the subdivision was submitted to the planning board (as was required by G. L. c. 41, § 81O) or was approved by that board.

[8] It does not necessarily follow, as the dissent would suggest, that the Salinettis' back land is rendered economically unuseable for a single residence by reason of the doubtless high cost of constructing a road complying with the rules and regulations of the planning board. The planning board is given ample authority by G. L. c. 41, § 81R, as amended by St. 1955, c. 411, § 1, to waive strict compliance with its rules and regulations in light of "conditions limiting the lots upon which buildings may be erected and the number of buildings that may be erected on particular lots." Conditions guaranteeing that the road would serve only one residence would surely warrant reasonable adjustments to road specifications drafted in con-

5. *Conclusion.*

It follows from what we have stated that the judgment of the Superior Court is reversed and a new judgment is to be entered that the decision of the zoning board of appeals of Lee was in excess of its authority and is annulled.

*So ordered.*

CUTTER, J. (dissenting). I assume (see part 2 of the majority opinion) that the trial judge reasonably could find (but was not required to do so) that the now remaining plaintiff, Mrs. Gordon, had standing. I disagree, however, with the determination in part 4 of the opinion that the judge could not decide that the town zoning board of appeals acted within its authority in granting the variance, even under what in *Guiragossian* v. *Board of Appeals of Watertown,* 21 Mass. App. Ct. 111, 118 (1985), are described as "new requirements for variances" imposed by the present G. L. c. 40A, § 10, as appearing in St. 1975, c. 808, § 3 (and as later amended by St. 1977, c. 829, § 4B).

The majority's conclusion that a variance must be denied rests essentially upon the circumstances that, in 1976, the Salinettis (with knowledge of the zoning requirements) sold portions of their frontage on Fairview Street without retaining the zoning minimum of 125 feet of frontage on that street to provide access to the more than five acres of back land of the locus. That back land then could not, and now cannot, be developed for more than one dwelling because of its physical peculiarities. These include a significant slope from north to south, a serious water condition, lack of all access from the south (because of the Massachusetts Turnpike), and the prohibitive cost of constructing a town approved street along the

templation of their serving developments. Frontage on a road thus approved by the planning board could eliminate the necessity for a variance. The planning board would have jurisdiction because of the 1976 subdivision (see note 7, *supra*), whether by way of original approval (if approval was not sought in 1976) or by way of amendment under G. L. c. 41, § 81W.

northern part of the Salinettis' property.[1] Salinetti, faced with these considerations, decided to sell what front lots he could dispose of then and to treat the back land as essentially only a wood lot. By the sale to Brisson, he made the large locus a nonconforming lot.

By 1983, the Salinettis had an apparently unexpected opportunity to sell the locus to Scheurer. This was dependent upon whether a variance from the frontage requirement could be obtained permitting access to the one part of the east portion of the locus on which a residence as a practical matter could be built.

The evidence justified the town board (presumably familiar with local conditions) and the trial judge in concluding that the peculiarities of the locus (and a rising demand in a largely rural community for the large single family house lots) made appropriate some relaxation of the zoning frontage requirement. They reasonably could decide that a variance was a practicable method of relieving the hardship to the Salinettis which existed in 1976, and essentially continued even after the sale to Brisson. The zoning by-law, as applied to the Salinettis' 1976 holdings, appeared to make it necessary for the owner to choose between (a) having one house lot on the Fairview Street side of his land

---

[1] The majority opinion (nn. 7 and 8) ingeniously suggests that the original sale in 1976 to Brisson constituted a subdivision and, therefore, should then have been subjected to the town planning board's scrutiny under the Subdivision Control Law, especially G. L. c. 41, §§ 81O, 81R, and 81W. The present record does not reveal what action was sought or taken under the Subdivision Control Law in 1976, or what planning board regulations were outstanding in 1976 and what are now in effect. The town zoning by-law in § 1 defines "Street, Road, Avenue, Terrace etc," as "A public way, *or a way qualifying under the Subdivision Control Law,* giving access to a lot or lots" (emphasis supplied). The planning board in 1976 could have relaxed (under c. 41, § 81R) any regulation then in effect to make a simple driveway adequate for access to one single family house and garage on the Salinettis' back land. The board could have imposed conditions such as forbidding all other houses on the back land, and requiring that the back land be kept as rural space without excessive tree harvesting. The present record suggests no reason why resort to the planning board may not still be had. The case, however, has been argued before us only on the issue of the validity of a variance on the facts shown in this record.

(and no house on the back land), and (b) retaining approximately one vacant lot on Fairview Street to provide frontage to justify one house on the northern part of the eastern back land of the locus. The possible alternative procedure before the planning board (see note 1, *supra*) does not appear to have been considered in 1976 and, in any event, has not been shown to have been attempted.

The situation must frequently arise where the somewhat procrustean inflexibility of certain rural zoning by-laws leads to the development first of the most appropriate land for residences while leaving the owner of essentially unusable and less accessible back land (distant from any laid out street) without financially practicable means of complying with zoning requirements to realize some of its value.[2] In the present case the sensible grant of a variance has not been shown to have caused significant harm to any abutter or to have detracted from the integrity of the residential zoning of the area. It avoids a continuing hardship to the Salinettis and permits the most economic use of the locus.

From the public standpoint the variance turns a partly cut-over wood lot of negligible value into an unusually large lot (more than ten times the applicable minimum lot size of 20,000 square feet) for only one substantial residence, a matter of local tax advantage and in no way inconsistent (except as to the frontage situation) with the basic zoning scheme. Indeed, the permissible removal of the remaining trees from the locus (as seemed a possibility at one time) in all probability might be a substantial harm to the zone. Mrs. Gordon is relying upon the circumstance that the Salinettis in 1976 did not keep 125 feet of frontage (in itself a matter of no intrinsic harm to her with only a right of way to Fairview Street) as a method of preserving privacy (for her thirty acres east of the locus) which she has enjoyed

_____

[2] The procedure discussed in nn. 7 and 8 of the majority opinion, and 1, *supra,* once generally recognized and appropriately applied by planning boards, can avoid many instances of real hardship leading to applications for variance. It seems a reasonable method of affording economical means of access to otherwise unbuildable back land without resort to the variance process.

since 1976 essentially because the Salinettis were not then in a financial position to pay for an access street.

I think that the unfavorable physical characteristics of the locus, and the circumstances leading to the grant of the variance, provided the required additional reasons for a variance to satisfy the statement in *Warren* v. *Zoning Board of Appeals of Amherst,* 383 Mass. 1, 13 (1981), that the "creation of a nonconforming parcel by . . . a conveyance does not *without more*" (emphasis supplied) entitle the owner of the nonconforming parcel thus created to a variance. In this case there is a good deal "more" in the way of support for a variance than the circumstance that a nonconforming lot was created by the Salinettis. The emphasized words "without more" suggest that the principle in fact applied in the *Warren* case is not to be regarded as inflexible for all time merely because a present or former owner once possessed enough street frontage to satisfy the zoning by-law.

APPENDIX.

## SKETCH
## of SUBJECT PROPERTY

MASSACHUSETTS   TURNPIKE

NOT   TO   SCALE