## Commonwealth *vs.* Patrick Bibbo.

No. 98-P-2079.

Essex. February 8, 2000. - January 4, 2001.

Present: Jacobs, Rapoza, & Gelinas, JJ.

*Burglary. Stalking. Intent. Practice, Criminal,* Required finding, Instructions to jury, Presumptions and burden of proof.

Evidence at the trial of an indictment for unarmed burglary was sufficient to warrant the jury to conclude that the defendant intended to commit a felony, namely, to stalk the victim [653-654], and there was evidence exclusive of the act of breaking and entering to support the conclusion that the defendant intended to stalk the victim [654-655].

At the trial of an indictment for unarmed burglary, the judge's instructions on the element of intent to commit a felony were correct and did not lessen the Commonwealth's burden of proof. [655-656]

Indictment found and returned in the Superior Court Department on February 14, 1996.

The case was tried before *Howard J. Whitehead,* J.

*J. Thomas Kerner* for the defendant.

*Catherine Langevin Semel,* Assistant District Attorney, for the Commonwealth.

Rapoza, J. The defendant appeals from his conviction of unarmed burglary.[1] Specifically, he contends that (1) the trial judge erred when he permitted the jury to consider whether the defendant had intended to commit the felony of stalking for purposes of the burglary charge and (2) the trial judge's instruction with respect to the intent to commit a stalking impermissibly lessened the Commonwealth's burden of proof. We affirm.

1. *Factual background.* We summarize the relevant facts. In October, 1994, the defendant met Melanie Castellucci at a home-

---

[1]The defendant was also convicted on five counts of violating a restraining order and one count of stalking. As to those convictions he raises no argument on appeal. He was acquitted of assault and battery and burglary while armed.

less shelter in Keene, New Hampshire, where she was an employee. The defendant was homeless, had a history of alcoholism, and took medication to control a mood disorder. Castellucci counseled the defendant and also permitted him to stay at her family's farm in Swanzey, New Hampshire. The defendant worked on the farm and, over the course of time, developed romantic feelings for Castellucci which were not reciprocated.

Following an incident on the farm in July, 1995, during which the defendant became belligerent toward Castellucci's husband, who was disabled as the result of a massive stroke, he was asked to leave. Although the defendant did leave, he later returned and was found hiding in the barn. The police were called, and he was removed from the premises. From that point on, the defendant engaged in an intense and protracted campaign of harassment aimed at Castellucci. He telephoned her repeatedly at her home in New Hampshire. He also made numerous calls to her at her new job at the Association for Retarded Citizens (ARC) in Danvers. In addition, he wrote notes to her, as well as to her supervisor at ARC.[2] Castellucci began to see the defendant, almost daily, across the street from her workplace or in her employer's parking lot. On these occasions he appeared to be upset or angry, and his manner was often threatening. Castellucci's reaction was predictable: she lived in a state of constant fear of the defendant and was often observed crying at work.

On October 10, 1995, the defendant entered Castellucci's car, without her consent, while she was stopped at a traffic signal in Danvers. He physically restrained her from leaving the car and was "furious, screaming [and] vicious." She drove around the corner to a construction site which had a police detail, jumped out of the vehicle and screamed for help. When an officer approached, the defendant attempted to explain to him that he and Castellucci were merely having a "lovers' quarrel," but she asked that he be removed from her car, which the officer did. Another officer at the scene instructed the defendant not to contact Castellucci again.

That afternoon, Castellucci obtained a restraining order against the defendant which was served on him at the Boston

---

[2]Castellucci began saving the written notes and the numerous recorded messages left by the defendant at her home and office. They were later admitted in evidence at trial.

homeless shelter where he was then staying. Nevertheless, he continued to place harassing telephone calls to Castellucci. The order was extended on October 23, 1995, following a hearing at which the defendant was represented by counsel.

The defendant persisted in attempting to contact Castellucci, despite the restraining order, and he left telephone messages that were increasingly threatening in nature.[3] On October 24, 1995, he left a message stating that he was going to find out where she lived and that he was "going to get [her]." The next day he left another message, saying that "it was just a matter of time" and that she "wasn't going to make it until Christmas."

Because she was working in Danvers, Castellucci had been spending only weekends at her home in New Hampshire. During the week she stayed in Beverly in a house maintained by ARC. On the weekend of November 11 and 12, 1995, she received numerous messages from the defendant on her telephone answering machine in New Hampshire, one of which stated that "within twenty-four hours [she] was going to be a dead woman."[4] She contacted the local police who remained at the farm with her husband and children while she went back to Massachusetts for the work week. When Castellucci arrived at her office on Monday morning, she was greeted by a voice-mail message from the defendant stating that her "time was up" and that he knew where she lived. He described the house where she was staying in Beverly and said that it "would be soon when [she] saw him."

Before leaving for work on November 14, 1995, Castellucci contacted a detective in the Beverly police department to convey her concerns about the defendant. At work another voice-mail message from the defendant informed her that she would "see him soon." That day she left work at the usual time and returned to the house in Beverly. She went through the house to make certain that the windows were locked. Her daughter arrived with her boyfriend some time after 7:00 P.M. to stay with her. Castellucci gave them a tour of the house and then left with her daughter to pick up some items at the store. During the time

---

[3]At one point, the defendant left the following message: "All I think about is blowing you away. . . . I know where you are. The last thing you're going to see is me. I think you're going to scream when I'm picking the meat off your bones."

[4]Castellucci testified that the repeated messages came in so quickly that the answering machine was unable to keep up with them.

that they were gone, the boyfriend heard a noise upstairs but did not investigate because he thought it had been caused by the cat.

More than an hour after she had returned from the store, Castellucci went upstairs to get some blankets. While standing in her bedroom, she felt a breeze coming through an open door which she had closed earlier. She went through the door into the next room where she discovered an open window, a plant knocked to the floor, and a damp spot on the rug. She then left the room and screamed, "I think he's in the house; we've got to call the police." Her daughter dialed 911, and police officers arrived at the house soon thereafter.

The officers inspecting the second floor observed a cut window screen along with signs of forced entry around the open window. A room-to-room search was conducted until the defendant was found hiding in the third-floor crawl space, partially concealed beneath some insulation. The officers who frisked him found a folding knife with a two to two and one-half inch blade in the pocket of his pants.

At trial the defendant acknowledged leaving almost all of the threatening messages that were recorded by Castellucci. His defense was aimed at discrediting Castellucci, claiming that his intention in contacting her was to retrieve money from disability checks that he had turned over to her while he was living at her home. He also intimated that they had been involved in a relationship that he had tried to terminate. With respect to the burglary, the defendant maintained that he was in the house at Castellucci's invitation, that he had come in through an open back door when no one was home, and that he had fallen asleep in a third-floor room. He stated that he only hid in the crawl space when he heard the police officers coming up the stairs.

The defendant moved for a required finding of not guilty at the close of the Commonwealth's case and, again, at the close of all the evidence. Both motions were denied. The defendant specifically objected to the submission to the jury of the burglary charge on the theory that he had broken into and entered the house with the intent to stalk Castellucci. The defendant unsuccessfully renewed the objection at the charge conference.

The trial judge instructed the jury that, in order to find the defendant guilty on the burglary charge, they were required to find that the defendant acted with the intent to commit one (or more) of the following felonies: (1) to kill; (2) to commit as-

sault and battery with a dangerous weapon; (3) to assault by means of a dangerous weapon; or (4) to stalk. The trial judge also instructed the jurors as to the elements constituting the crime of stalking. He further told them that the burglary charge could be sustained on the theory of an intent to stalk only if they found that the defendant "specifically intended to commit an act which in the circumstances, when considered in conjunction with the other actions of the defendant, would constitute an act of stalking." At the close of the charge to the jury, the defendant again objected to the submission of the burglary charge on the theory of intent to stalk.

2. *Intent to commit a felony: stalking.* On an unarmed burglary charge, the Commonwealth must prove beyond a reasonable doubt that the defendant broke into and entered a dwelling in the nighttime with the intent to commit a felony. *Commonwealth* v. *Wygrzywalski*, 362 Mass. 790, 792 (1973). The defendant's intent to commit a felony may be inferred from all the evidence, including his conduct. *Commonwealth* v. *Lewis*, 346 Mass. 373, 378 (1963). *Commonwealth* v. *Claudio*, 418 Mass. 103, 118 (1994). As the defendant asserts that he was entitled to a required finding of not guilty primarily due to the insufficiency of the evidence as to intent, we review his claim of error to determine "whether, taking all of the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the Commonwealth, a rational jury could have found the essential element of intent beyond a reasonable doubt." *Commonwealth* v. *Stoddard*, 38 Mass. App. Ct. 45, 48-49 (1995). See *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-678 (1979).

In this case, "[a]s in most instances where intent is an element of the crime charged, there was no direct evidence of the defendant's actual state of mind at the time of the [breaking and entering]. In such situations, intent may be proven circumstantially 'by inference from all the facts and circumstances developed at the trial . . . .' " *Commonwealth* v. *Stoddard*, 38 Mass. App. Ct. at 49, quoting from *Commonwealth* v. *Stewart*, 411 Mass. 345, 350 (1991). The inferences drawn by the jury need not be necessary or inescapable, but only reasonable and possible. *Commonwealth* v. *Stewart*, 411 Mass. at 350.

The defendant asserts that the Commonwealth failed to prove that he intended to commit the felony of stalking on the night

he broke into and entered the victim's home.[5] Essentially, he argues that it is legally impossible to commit a stalking during the course of a single event because that crime requires a pattern of conduct or a series of acts involving more than two incidents of harassment or following. See *Commonwealth* v. *Kwiatkowski*, 418 Mass. 543, 547-548 (1994) (pattern of conduct or series of acts, for purposes of harassment violation of stalking statute, must involve more than two incidents); *Commonwealth* v. *Alphas*, 430 Mass. 8, 15 (1999) (under "following" prong of statute, Commonwealth is required to prove more than two incidents of following). The defendant claims that he could not have engaged in three acts of harassment or following during a single episode and, thus, he could not have intended to commit to completion the felony of stalking at the time of the break-in. Rather, he contends that he could only have intended to commit a single act which, by definition, cannot constitute stalking. As a result, he maintains that there was no evidence of an intent to commit the felony of stalking, and his motion for a required finding of not guilty should have been allowed.

The defendant correctly states that a single act of either harassment or following does not amount to a stalking. But the incident on the night of November 14, 1995, did not stand alone. Indeed, the events of that evening were the culmination of a pattern of persistent harassment and following of Castellucci between July and November, 1995. The evidence of this conduct was overwhelming and separately supported the defendant's conviction on the stalking indictment.[6] In that context, there was sufficient evidence for the jury to conclude that the defendant's breaking and entry into Castellucci's house was done with the intent to commit a further act of stalking. The trial judge properly and thoroughly instructed the jury on

[5]Following the Supreme Judicial Court's decision in *Commonwealth* v. *Kwiatkowski*, 418 Mass. 543 (1994), the Legislature amended the stalking statute, G. L. c. 265, § 43, to eliminate the distinction made between stalking by harassment and stalking by following. St. 1996, c. 298, § 11. Although the events of this case predate that amendment, the judge correctly instructed the jury consistent with the statutory interpretation set out in *Kwiatkowski*.

[6]The record is replete with incidents from which the jury could have found the requisite "more than two" acts necessary to constitute a stalking. *Commonwealth* v. *Kwiatkowski*, 418 Mass. at 548. As previously noted, the defendant does not appeal from his conviction for stalking.

this point, stating twice that

"what the Commonwealth has to prove is that the defendant specifically intended to commit an act *which in the circumstances, when considered in conjunction with other actions of the defendant,* would constitute an act of stalking" (emphasis supplied).

In the circumstances of this case, the jury were warranted in concluding that the defendant entered Castellucci's home with the intent to stalk her.

The defendant also asserts that his conviction should be reversed because the jury could have improperly inferred the intent to stalk from the breaking and entering alone. In the absence of any law directly supporting his position, the defendant relies, by analogy, on the merger doctrine developed with respect to the felony-murder rule. While it is true that assaultive acts which cause a victim's death may not form the basis of a felony-murder conviction, see *Commonwealth* v. *Quigley,* 391 Mass. 461, 466 (1984), cert. denied, 471 U.S. 1115 (1985), the reasoning behind the merger doctrine is not germane to the present case. The merger doctrine is necessary in the felony-murder context because, if assaultive acts were allowed to constitute the basis of a felony-murder conviction, all forms of homicide (such as second-degree murder and manslaughter) could be elevated to first-degree murder based upon the rule. In essence, the distinctions among the different forms of homicide would become meaningless because every second-degree murder or manslaughter necessarily could be elevated to a first-degree murder based on the underlying felonious assault. *Commonwealth* v. *Gunter,* 427 Mass. 259, 272 (1998).

The same reasoning does not apply in the case of burglary. Unlike homicide, where every death is accompanied by some kind of assaultive act, not every burglary includes an act of stalking. Similarly, as the Commonwealth points out, the convictions are not duplicative. See, e.g., *Commonwealth* v. *Donoghue,* 23 Mass. App. Ct. 103, 111-113 (1986), cert. denied, 481 U.S. 1022 (1987). Therefore, the act of breaking and entering does not inescapably merge with an intent to commit a stalking. Moreover, the record supplies sufficient evidence, other than the breaking and entering, from which the jury could have inferred an intent to commit an act of stalking. In addition

to portraying the defendant's continuous, escalating course of conduct toward Castellucci, the record indicates that, on the night of the breaking and entering, the defendant was armed with a knife; after entering the dwelling he apparently walked through the house from the second to the third floor; he hid on the third floor while Castellucci and her family were downstairs; he remained in the house for over two hours before he was eventually detected; and he concealed himself beneath layers of insulation on the third floor to avoid detection by police. Those actions, "when considered in conjunction with other actions of the defendant" exclusive of the defendant's act of breaking and entering, supported the jury's conclusion that the defendant had the intent to stalk Castellucci.

3. *Jury instructions.* Finally, in a reprise of his earlier argument that a single incident is insufficient to prove an intent to commit a stalking, the defendant asserts that the judge's instructions lessened the Commonwealth's burden of proof on the element of intent to commit a felony. Specifically, the defendant claims that the jury charge concerning intent created a presumption that relieved the Commonwealth of proving that he intended "to fully commit the crime of stalking."

"The test of whether the challenged portion of the instructions created an impermissible presumption is this: 'If a specific portion of the jury charge, considered in isolation, could reasonably have been understood as creating a presumption that relieves the State of its burden of persuasion on an element of an offense, the potentially offending words must be considered in the context of the charge as a whole,' to see whether 'a reasonable juror could . . . have considered the charge to have created an unconstitutional presumption.' " *Commonwealth* v. *Sibinich,* 33 Mass. App. Ct. 246, 247-248 (1992), quoting from *Commonwealth* v. *Blake,* 409 Mass. 146, 151 (1991). It is necessary, then, to consider "the reasonable impression that a jury would have from the judge's instructions as to their fact-finding obligations." *Commonwealth* v. *Doherty,* 411 Mass. 95, 105 (1991).

The judge's instructions to the jury did not create a presumption that lessened the Commonwealth's burden of proof on the element of intent to commit a felony. Having defined in detail the underlying felony of stalking, the judge properly instructed the jurors that the Commonwealth had to prove that the

defendant "specifically intended to commit an act which *in the circumstances, when considered in conjunction with other actions of the defendant,* would constitute an act of stalking" (emphasis supplied). The fact-finding obligations of the jury were clearly set out by the trial judge, see *Commonwealth* v. *Doherty,* 411 Mass. at 105, and the jury's guilty verdict on the separate stalking indictment indicates that the jury understood the nature of the underlying felony. The judge gave an appropriate instruction on the element of intent to commit the felony of stalking, the Commonwealth's burden of proof was not lessened, and there was sufficient evidence from which the jury properly could conclude that the defendant did break and enter Castellucci's house with the intent to stalk her.

*Judgments affirmed.*