Hely, J.
A. Introduction
The plaintiff objects to the decision of the Plymouth Zoning Board of Appeals granting a special permit for a forty-two unit residential condominium project. The plaintiff owns a storage warehouse and land across the railroad tracks from the site. The complaint seeks judicial review under G.L.c. 40A, §17.
The site for the proposed development is on Hedge Road in a waterfront district along the harbor in North Plymouth. The special permit was issued subject to environmental design conditions. The developer is the defendant Gladstone Development Corp. The other named defendants are the members of the Zoning Board of Appeals.
Based on the court’s independent findings of fact, the Zoning Board of Appeals decision granting the special permit is affirmed. The board’s decision carefully applied the requirements and criteria in the Plymouth Zoning Bylaw. The decision did not exceed the board’s authority. G.L.c. 40A, §17. The board’s decision was not based on a legally untenable ground, and it was not arbitrary or an abuse of discretion.
The case was tried before the court on June 12,13 and 16, 2003. The findings of fact stated in this Memorandum of Decision are based on the evidence presented at the trial, the court’s view of the site and the immediate surroundings, and the reasonable inferences that the court has drawn from the evidence.
*544 B.Judicial Review Standard and Special Permit Standard
In appeals from the granting of a special permit, the burden of proof is on the applicant for the special permit. Dion v. Board of Appeals of Waltham, 344 Mass. 547, 555-56 (1962); Knott v. Zoning Board of Appeals of Natick, 12 Mass.App.Ct. 1002, 1004 (1981). Judicial review under G.L.c. 40A, §17, is on the facts found by the court.
Judicial review is nevertheless “circumscribed.” Roberts v. Southwestern Bell Mobile Systems, Inc., 429 Mass. 478, 486 (1999). The decision of a local board of appeals on a special permit decision “cannot be disturbed unless it is based on a legally untenable ground, or is unreasonable, whimsical, capricious or arbitrary.” Id.; see Davis v. Zoning Board of Chatham, 52 Mass.App.Ct. 349, 355-56 (2001). The court on judicial review of a special permit decision “does not possess the same discretionary power as does the board.” Nugent v. Board of Appeals of Granby, 22 Mass.App.Ct. 909, 910-11 (1986). The court cannot substitute its judgment for that of the board on discretionary matters. Davis v. Zoning Board of Chatham, 52 Mass.App.Ct. 349, 356 n. 11 (2001).
C.The Existing Site
Plymouth Shores Development, Inc. ("Plymouth Shores”) owns the site where Gladstone proposes to build its condominiums. The total lot area is about eleven and a quarter acres. The northeast side of the site abuts the Sgarzi property for about 260 feet and then abuts the shoreline for about 750 feet.
There are no structures on the property. The site was once used for a brick kiln. The site has not been used for any active commercial or residential purpose for many years. There is a pond on the northwest half of the site that covers about a quarter of the total site. For years, the pond has been surrounded by overgrown wild vegetation. The pond is not visible at ground level unless one pushes through the vegetation right to the water’s edge.
Gladstone proposes to build eight residential condominium buildings, all on the hill on the southeast half of the lot. The hill is known as High Bluff. The hill abuts the shoreline with a steep sandy cliff descending to a rocky beach. The hill is presently covered with trees. Plymouth Shores owns the site as private property, including the 450 feet of shoreline next to the hill and another 300 feet of shoreline extending northwest from the hill area.
Gladstone’s proposed project includes a swimming pool and recreation building in the west comer of the site near the entrance from Hedge Road. The proposed development will also include private roadways, ground level parking inside and near the residence buildings, a boardwalk around most of the pond, and a gazebo on the east side of the pond.
D.Precluding Public Access
Section 401.09 of the bylaw is the basic regulation for uses in a waterfront district. There are a few waterfront districts in Plymouth. The main one is in the town center. The Gladstone site is two miles north of the town center in the waterfront district in the North Plymouth neighborhood.
Section 401.09B provides for several “Allowed Uses,” such as boat sales or service, marine repair yards, commercial fishing, and wholesale or retail seafood outlets. Gladstone proposes a multi-family residential use. Such a use is designated in Section 401.09C5 as one of the “Special Permit Uses Subject to Environmental Design Conditions.” Under this subsection, multi-family residential complexes in a waterfront district may qualify for a special permit “provided such complexes are designed not to preclude public access to and along the shoreline.” The court finds from the evidence that the Gladstone project is designed so as not to preclude public access to and along the shoreline.
Plymouth Shores’ existing private ownership of the land extends to the mean low water mark along the site’s shoreline, subject to the public’s right of access to the area between the mean high and low water marks for fishing, fowling and navigation. The public’s existing right of access “along” the shoreline is thus limited to this traditional access to the area between the mean high and low water marks for fishing, fowling and navigation. Opinion of the Justices, 365 Mass. 681, 684-85 (1974). The construction of the proposed condominium project will not alter this limited existing public right of access along the shoreline. For natural reasons the existing beach is somewhat difficult to walk on because it is covered with rocks ranging in size from golf balls to basketballs. The condominium project will not change the beach walking conditions for walkers with fishing rods, fowling pieces or sextants. The project will not create any new artificial or natural barriers to the public’s lateral access to the area between the high and low water marks for fishing, fowling and navigation.
The project likewise will not change or preclude public access “to” the shoreline. At present there is no public land access to the shoreline in this neighborhood except by walking between the high and low water marks to this neighborhood from other neighborhoods. The nearest legal public access or public right of way to the shoreline is the Nelson Street Recreation Area, about a mile south along the shore. The construction of the condominium project will not alter the existing limited public access to the shoreline.
E.Allowing Pedestrian Access
Section 401.09E2 of the bylaw states that all uses, premises, and structures “should be designed to allow pedestrian access to and along the shore for a minimum distance of ten (10) feet inland from the mean high water mark.” The plaintiff argues that under this *545 provision a special permit must provide for public pedestrian access across the Gladstone land to the shore and along the Gladstone land on the shore ten feet inland from the highwater mark.
As discussed earlier, there currently exists no public pedestrian access across the site and no public pedestrian access along the shore above the mean high water mark. The special permit issued by the board did not require the creation of such public access as a condition of the permit. The court assumes that it would have been constitutionally and legally permissible for the board to require such a condition as a concession from the developer of a large project. The court concludes, however, that Section 401.09E2 of the bylaw does not require the board to impose such a public access condition as a condition for the issuance of a special permit.
It is not clear that “designed to allow pedestrian access” in Section 401.09E2 means that a project’s design should create a new public access right of way across private land where such access did not previously exist. The court will assume that this “pedestrian access” language means pedestrian access for the general public, not just for the occupants and guests of the development. But even if this is the intent of the section, the section language does not make a public access right of way mandatory for every special permit. Instead, the by-law’s use of the term “should” leaves room for some discretion by the board in determining when to impose the creation of a public access right of way as a condition of a special permit.
Section 401.09E2 uses the word “should” in reference to pedestrian access to and along the shoreline. This is in contrast with the use of the mandatory term “shall” in the very next subsection, Section 401.09E.[1] The bylaw’s use of the term “should" regarding pedestrian access in Section 401.09E2 is precatory. It means that it is preferable or desirable, rather than mandatory, for the board to include public pedestrian access as a condition.[2]
The court’s interpretation of Section 401.09E2 is also supported by the interpretation of the Town’s zoning enforcement director and the Plymouth Zoning Board of Appeals. Neither the enforcement director, Richard Manfredi, nor the Zoning Board of Appeals has interpreted the “should be designed to allow pedestrian access” language in Section 401.09E2 as mandating the creation of a public access right of way across a private development site where such public access did not previously exist. The reasonable interpretation of the Town’s bylaw by the local officials charged with its enforcement is entitled to some deference, although deference does not mean abdication. Livoli v. Zoning Bd. of Appeals of Southbridge, 42 Mass.App.Ct. 921, 923 (1997); Massachusetts Auto Body Association, Inc. v. Commissioner of Insurance, 409 Mass. 770, 781 (1991). Recognizing that the ultimate responsibility for interpretation of the bylaw rests with the court, the court concludes that the provision “should be designed to allow pedestrian access” in Section 401.09 E 2 does not mandate the creation of a new public access right of way across a private development in a waterfront district where such a right of way did not previously exist.
The board did not abuse its discretion by not requiring the creation of a public access right of way in this case. There is presently little development in the vicinity of the project. The site of the Gladstone condominiums has not been actively used for many years. To the immediate north of the site are a small boat yard and some small commercial structures with offices and light industry. An eight-unit residential condominium project is under construction nearby on the north side of Hedge Road.
A little farther north is the Cordage Park area, a series of large brick and stone factories that were once used for rope making. Most of the factory space has long been vacant. In recent years there has been some business development in some of the factories for retail, office and light industry. South of the site along the shoreline are some single-family houses and some vacant formerly industrial parcels. There is also a neighborhood of small homes and a senior citizens apartment complex south of the site and inward from the shoreline.
An abandoned railroad runs along the southwest side of the site. The Town has recently purchased the railway land in this area. On the other side of the railroad sits the nearest Eight Mates parcel. This Eight Mates parcel has one commercial storage building and one pile of charred rubble that was a commercial storage building until a recent ñre. The plaintiff owns a few other parcels on the north side of Hedge Road including a small warehouse used to store wholesale quantities of beer. The Town is planning to develop a multi-use public trail on the rail bed that will extend about a mile south to the Nelson Street public beach recreation area.
The intent provision of the waterfront district section of the bylaw, Section 401.09A, includes the following objectives:
To encourage the development of marine, history or tourism related land uses and activities which take advantage of the peculiar characteristics of the watefront. . .
To aid in revitalization of the central area by encouraging uses which attract people into the area and generate pedestrian-oriented activiiy.
To complement the seasonal nature of the waterfront and tourist areas by establishing uses of year-round activity and vitality.
To require special Environmental Design Condition for special permit uses to insure, among other purposes, proper emphasis on a pedestrian environment, adequate pedestrian links between the *546 proposed development and surrounding properties, high standards of site planning, architectural design which is compatible with the adjoining historical area.
The board’s decision to issue the special permit with environmental design conditions responsibly served these objectives. Considering the neighborhood conditions as a whole, the board could reasonably conclude that Gladstone’s proposed residential project will enhance the economic vitality of the North Plymouth neighborhood and the entire town. The board could fairly conclude that this project will help complement the seasonal nature of the waterfront area by establishing year-round activity and vitality consistently with proper emphasis on a pedestrian environment and adequate pedestrian links with surrounding properties. The project as designed meets high standards of site planning and architectural design. The design is compatible with the historical area in North Plymouth and Plymouth. The board’s issuance of a special permit with conditions that do not include a public access right of way to and along the shoreline was not arbitrary, unreasonable or an abuse of discretion.
F. Natural Features Conservation and Other Specific Objections by the Plaintiff
Contrary to the plaintiffs arguments, the project and special permit satisfy the Environmental Design Conditions and Natural Features Conservation Requirements in Sections 205.03 and 301 of the bylaw. The board made the detailed review required by Section 205.03A and B. The board considered the concerns and favorable recommendations of the Design Review Board, the Fire Chief, the Town Engineer and the North Plymouth Steering Committee. The clearing of trees will be limited to the minimum necessary to construct the residential buildings and to provide access and reasonable open space in the immediate vicinity of these buildings. The design meets the absolute practical minimum clearing requirement of Section 205.03D. The design meets the maximum possible tree preservation requirement in Section 301.05. Trees of greater than five inches breast-height diameter will be preserved outside of the areas of actual construction activity. The site is not covered with mature trees of greater than five inches breast-height diameter. The provision in Section 301.05 that thinning should not exceed fifty percent does not apply.
The natural topography preservation requirements and criteria of Sections 205.03D1 and 301.04 have also been met. The residential buildings have been designed to fit into rather than alter the natural topography of the hill. Gladstone’s design includes extensive measures to limit grading changes. There will be an absolute practical minimum of disruption of natural topography and site features.
There is little support in the facts for the plaintiffs remaining objections to specific aspects of the project design. The parking is adequate and meets the bylaw requirements. Each residential unit will have a one interior garage space and one driveway space. The total number of on-site spaces in the design, including satellite spaces and clubhouse space, exceeds the minimum number of spaces required by the bylaw. The pool clubhouse building is not a “place of public assembly” under Section 305.11 so as to require an additional one space for each forty square feet of floor area.
The pool clubhouse is designed only for pool and recreation uses by residents and guests. It is not intended for use by the general public or for large gatherings of people. The board did not abuse its discretion in treating the pool clubhouse as a private recreational amenity for the condominiums and in not requiring a greater number of parking spaces. The design strives to reduce harmful environmental effects. Requiring unnecessary parking spaces would detract from this goal. It is unlikely that there will be significant numbers of residents who will regularly use more than two parking spaces.
The project will not cause any significant parking or traffic problems in the neighborhood. The project’s streets, driveways, parking areas and pedestrian walkways comply with Section 205.03D3. They are carefully designed with respect to topography, site features, circulation, and surrounding streets and ways.
With respect to fire safety, all buildings will have internal sprinkling systems and external water curtains that will be sufficient to offset access limitations under Section 300.05. In issuing the special permit, the board considered and applied the applicable fire safety provisions in the bylaw. It was not an impermissible delegation of responsibility for the board to require further approval by the Fire Chief of a revised hydrant location plan and a water main evaluation.
Gladstone sufficiently demonstrated to the board and to the court that the project will not violate the outdoor lighting regulation in Section 401.27.
The court finds that the testimony of Donald. F. Bracken, Jr. and Richard Manfredi was credible and highly reliable. Mr. Bracken is a professional licensed civil engineer. He was retained by Gladstone as the design engineer for the project. His responsibilities included making the design comply with the Plymouth Zoning Bylaw. Mr. Manfredi is the Director of In-spectional Services for the Town. He is responsible for enforcing the zoning bylaw. The testimony of Mr. Bracken and Mr. Manfredi was fair, impartial and professionally reliable. Their testimony is adopted as part of the court’s findings.
The Gladstone design is of exceptionally high standards. The design does not depart in concept or detail from the general criteria in Section 205.03, Environmental Design Conditions. To the extent that there may be such departures in the design, they do not *547 violate the intent of the bylaw or the Environmental Design Conditions. The board reached a similar conclusion applying Section 205.03F, Modification of Criteria for Excellence of Design. On the facts found by the court, the board’s conclusion was not unreasonable or an abuse of discretion.
G.Sufficiency of the Board’s Findings
There is no merit to the plaintiffs claim that the board made insufficient written findings in support of its decision. The board’s decision leaves no doubt that the board carefully considered and applied the requirements and criteria of the bylaw.
H.Particular Harm and Standing
One of the plaintiffs lots abuts the railway along on the southwest side of the Gladstone site. The plaintiff is an abutter to an abutter within three hundred feet of the site. The plaintiff is therefore entitled to a rebuttable presumption of standing to obtain judicial review. See G.L.c. 40A, §§11,17; Marashlian v. Zoning Board of Appeals of Newburyport, 421 Mass. 719, 721 (1996). If standing is challenged, the issue is decided as a question of fact on all the evidence with no benefit to the plaintiff from the presumption. Id.
The plaintiff “must put forth credible evidence to substantiate” her allegations of injury to her legal rights. Marashlian, 421 Mass. at 721, 723. The plaintiff is a “person aggrieved” under G.L.c. 40A, §17, if she “suffers some infringement of . . . [her] legal rights.” Marashlian, 421 Mass. at 721. The plaintiff must present evidence of “ ‘a plausible claim of a definite violation of a private right, a private property interest, or a private legal interest’ ” that is protected by the zoning law. Bell v. Zoning Board of Appeals of Gloucester, 429 Mass. 551, 554 (1999); Rinaldi v. Board of Appeal of Boston, 50 Mass.App.Ct. 656 (2001). The plaintiff “must establish — by direct facts and not by speculative personal opinion — that . . . [her] injury is special and different from the concerns of the rest of the community.” Id.
The evidence supports only two non-speculative harms to the plaintiffs property interest based on her lot on the southwest side of the railroad tracks. The plaintiffs lot will lose some limited harbor view in the area behind her commercial storage building. The plaintiffs lot will also no longer enjoy the environmental and aesthetic benefits of a woods on her neighbor’s hill. A limited harbor view and a nearby woods make no difference to the plaintiffs current commercial use of this lot. These factors can, however, be an asset in selling or developing the lot for residential purposes. The plaintiff surely has no legal right or legal interest in keeping her neighbor’s lot totally undeveloped.
Nevertheless, environmental, conservation and harbor view benefits to the waterfront neighborhood are among the interests that must be considered under various provisions of the Plymouth Zoning Bylaw. It is not impermissible for a close abutter to an abutter to assert these interests in an appeal under G.L.c. 40, §17. Under the decision in Tsagronis v. Board of Appeals of Wareham, 415 Mass. 329, 330 n. 4 (1993), the court cannot find that the plaintiff lacks all standing. See Marashlian, supra, 421 Mass. at 724-25 n. 8; compare Circle Lounge & Grille, Inc. v. Board of Appeal of Boston, 324 Mass. 427, 429-30 (1949); Redstone v. Board of Appeals of Chelmsford, 11 Mass.App.Ct. 383, 385 (1981).
I.Bad Faith and Costs
Gladstone contends that the trust brought this action in bad faith and that it should be ordered to pay Gladstone’s costs. In an appeal for judicial review under G.L.c. 40A, §17, costs may be allowed against the party appealing from the local board’s decision if the plaintiff acted “in bad faith or with malice in making the appeal to the court.” G.L.c. 40A, §17, fifth par. In this context a finding of bad faith requires a finding that the plaintiff brought the judicial review action for an improper purpose, such as to harass or cause unnecessary delay, to drive up the opposing party’s costs, or to extract an unfair advantage or concession. See Hahn v. Planning Board of Stoughton, 403 Mass. 332, 337 (1988) (attorney fees and costs under G.L.c. 231, §65); cf. Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 474-75 (1991) (unfair practice in business-to-business dealings under G.L.c. 93A); United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 816-17 (1990). Gladstone has met its burden of proving that the plaintiff acted in bad faith and for an improper purpose.
The plaintiff trustee, Maureen Sheehan, is the wife of Gerald F. Sheehan. Gerald F. Sheehan is the president of L. Knife and Son, Inc., a large beer distribution business in the Plymouth and Kingston area. Gerald F. Sheehan and Maureen Sheehan are the parents of Margaret Sheehan. Margaret Sheehan is an attorney who works part-time as a legal counsel to L. Knife and Son, Inc. Margaret Sheehan is one of the beneficiaries of Eight Mates Trust. Margaret Sheehan was called as a witness by the plaintiff as the trust’s authorized spokesperson for the purpose of trial testimony.
The L. Knife and Son, Inc. business was started by Margaret Sheehan’s grandfather or great grandfather. L. Knife and Son, Inc. has close business and personal ties with Eight Mates Trust. The beneficiaries of Eight Mates Trust are the eight adult children of Maureen Sheehan and Gerald F. Sheehan or other trusts ben-efitting the children. The actual purpose of the Eight Mates Trust is to hold real estate for the benefit of the beneficiaries and for the benefit of the business and legal interests of the L. Knife and Son, Inc. business.
The warehouses and operating facilities of L. Knife and Son, Inc. are on land rented from Eight Mates Trust. The parcels owned by the trust in the Hedge Road area are either vacant lots or lots with commercial storage buildings used in the L. Knife and Son, Inc. beer distribution business. The trust parcels in *548 the Hedge Road area are kept by the trust either for the direct business need's of L. Knife and Son, Inc. or for long-term investment purposes.
David Martin is the operations manager for Gladstone. He sought out the responsible representative of Eight Mates Trust in an effort to consider the interests of the neighbors. The court accepts as truthful all of Mr. Martin’s testimony on these issues. Mr. Martin learned that Gerald F. Sheehan at the L. Knife and Son, Inc. was the person with authority to speak for the trust. Mr. Martin met with Mr. Sheehan at the L. Knife headquarters in Kingston. Mr. Sheehan had the express or implied authority to act as an agent for Maureen Sheehan as trustee for Eight Mates Trust. Mr. Sheehan held himself out as the person with authority to make decisions regarding the Eight Mates land. Brian Maguire, the operations director of L. Knife and Son, Inc. also spoke with Mr. Martin in regard to the interests of L. Knife and Son, Inc. and the trust. Gerald F. Sheehan was the central decision maker for Eight Mates Trust in its relations with Gladstone and in the pursuit of this litigation.
Mr. Martin told Mr. Sheehan about Gladstone’s development plans for the site. Mr. Sheehan said he might be interested in selling the neighboring Eight Mates parcel to Gladstone. Mr. Sheehan said he had been approved for fifty-five to seventy residence units on the Eight Mates land. Mr. Sheehan also told Mr. Martin that he would like to obtain an easement to the shoreline for the Eight Mates land.
Mr. Martin asked Mr. Sheehan how much he wanted for his property. Mr. Sheehan replied “a fortune.” Mr. Martin was still interested and asked if it would take a large fortune or a small fortune. They had some further discussion, but no specific proposals emerged for purchasing the Eight Mates parcel.
Mr. Martin received a call from a developer who was engaged in some preliminary discussions with Gerald F. Sheehan about a possible development on the Eight Mates parcel across the tracks from the Gladstone site. The developer knew that Eight Mates Trust was objecting to the Gladstone development. The developer wanted to know if Gladstone would “counter-object” to an Eight Mates Development.
The plaintiff trustee did not testify. She likewise did not call Gerald F. Sheehan as a witness to rebut Mr. Martin’s testimony on the bad faith issues.
From the evidence and reasonable inferences the court finds that Eight Mates Trust brought this action in bad faith and for improper purposes. Its purposes were to unfairly extract an economic advantage or a right-of-way concession from Gladstone and to block or drive up the costs of a project that might compete with development on the Eight Mates parcel. These purposes are not related to the legitimate interests protected by the zoning statute and bylaw. Fair business competition is not a bad thing. Abuse of court proceedings is.
Gladstone’s expenses caused by this litigation have been considerable. For example, Gladstone has had to pay several thousand dollars just to extend its purchase and sale agreement while the case has been pending. This and similar development costs are not recoverable costs under G.L.c. 40A, §17, even though the action was brought in bad faith.
Gladstone’s attorney fees are likewise not recoverable. G.L.c. 40A, §17, does not authorize recovery of attorney fees. G.L.c. 231, §6F, does not permit an attorney fee award in this case because some of the Eight Mates claims were not frivolous, even though the action was brought in bad faith. Gladstone’s recoverable costs are limited to fees for the service of process, witness attendance costs at a statutory rate, and such reasonably necessary deposition costs as are allowed in the court’s discretion. Waldman v. American Honda Motor Co., 413 Mass. 320, 322-24, 326-28 & n. 11 (1992).[3]
J. Order
A judgment will enter affirming the decision of the Plymouth Zoning Board of Appeals issuing a special permit subject to environmental design conditions to Gladstone Development Corp.
Gladstone may submit an affidavit of costs to be included in the judgment, including reasonably necessary deposition costs. If the plaintiff contests the amount of the costs in the affidavit, she may file a written opposition and may request a hearing.

Section 401.09E3 states that the minimum setback of major structures from the mean high water mark “shall” be twenty-five feet unless wetland regulations apply.

See Qwest Corp. v. Federal Communications Commission, 258 F.3d 1191, 1200) (10th Cir. 2001) (“The term ‘should’ indicates a recommended course of action, but does not itself imply the obligations associated with ‘shall’ ”); United States v. Rogers, 14 Fed.Appx. 303, 305 (6th Cir. 2001); United States v. Maria, 186 F.3d 65, 70 (2nd Cir. 1999) (“Thus, the common meaning of ‘should’ suggests or recommends a course of action, while the ordinary understanding of ‘shall’ describes a course of action that is mandatory”); State v. Garrett, 80 Wash.App. 651, 652, 910 P.2d 552, 553 (1996) (“A provision containing both ‘should’ and ‘shall’ presumes lawmakers intended to distinguish between the terms .. .’Should’ is permissible and expresses a desire or request”); State v. Stamper, 615 So.2d 1359, 1365 (La.App. 1993) (“The word ‘should’ is not mandatory”); cf. McCarty v. Boyden, 275 Mass. 91, 93 (1931) (“The word ‘shall’ in a statute commonly imports an imperative order and not a precatory suggestion”).

Gladstone also questions whether the Eight Mates trustee, Maureen Sheehan, ever approved of the judicial review complaint before it was filed in her name. Gladstone argues that the decisions were made by Gerald F. Sheehan. This alone is not a basis for dismissing the complaint or for a finding of bad faith. Maureen Sheehan implicitly authorized Gerald F. Sheehan to speak for her on trust matters. Maureen Sheehan implicitly ratified the filing of this action.